All ready to hear argument in the first case of the morning, Access Living v. Uber. Mr. Blonder. Thank you and may it please the court. My name is Stephen Blonder and I represent Access Living and Ronnie Patrick. I'm here today asking that you reverse Judge Shah and allow Ronnie Patrick and Access Living to file an amended complaint to proceed with their claims. This case involves a fundamental issue in the new economy. Whether businesses, such that were created after 1990 when the ADA went into effect, are covered by the statute. We brought this case because Uber, a modern day transportation service, which is surpassing all the other transportation services around, and companies like it, whether it's Lyft and others, are engaging with online apps and take the position that they're not subject to the civil rights laws such as the ADA because they don't operate out of a physical location and they're simply an electronic exchange, matching one person to another, and they're not actually providing any service. We believe that that's an error. Judge Shah, in fact, also found that that was an error. Counsel, I don't understand that issue to be before us now. If I understand correctly, this case is before us on an argument that your clients had not established standing and that the amended complaints were not, didn't change that. I think we need to address that rather than other issues that might or might not be relevant on remand. I don't understand Uber even to be contesting the points you're now making. So let's get to what's the reason we're here. Okay. Thank you, Judge Easterbrook. And we believe it's involved in the analysis because one of the necessary findings to allow us to amend our complaint is that we can state a claim, with the necessary component of that claim being that Uber would be subject to the ADA. So in Runyon. I must say, Counsel, stating a claim and standing are different things. You can choose what you wish to address, but if you don't address the point on which you lost, you can see the difficulty. That's right, Your Honor. In Runyon, this court talked about the presumption in favor of giving plaintiffs one opportunity to amend, and their liberal amendment standard, especially where the law may be uncertain. Here, in Runyon and Judge Hamilton's opinion, goes into- Counsel, it doesn't make any difference who wrote the opinion of the court. They speak for the court. Correct. In the court's opinion, it talks about, originally, a plaintiff whose original complaint has been dismissed should be given at least one opportunity to try to amend before the entire action is dismissed. Here, Judge Shaw did not permit that one opportunity to amend. Judge Shaw's original decision, in which he- I hope you will deal with the ground on which you lost. The district judge said, of course one can amend the complaint, but this amendment doesn't cure the problem. That's what you need to address. And we believe that the amendment does cure the problem because- Okay, finally, you're getting to what matters. And I'll deal with access living first, and then Ronnie Patrick. And I understood the district court's reasoning, you can correct me if I'm wrong, Mr. Blonder, to simply be that the alleged injury in the proposed amended complaint to the entity plaintiff access living is not direct enough. And it reflected an interpretation both of 12-188 and 12-182-B1E. And 184, that's correct. Right. And so maybe you could focus on the statutory language and address why you think there was an error in the construction of that language. 12-188 talks about, in the remedy section, and it talks about who can bring a claim, and it talks about remedies are available to such person about subject- reasonable grounds, sorry, to any person who is being subjected to discrimination on the basis of disability in violation of the chapter, or as reasonable grounds for believing that such person is about to be subjected to discrimination. Person is defined in the statute involving both an individual or an entity. That kind of carries through the statute. So the issue is, was someone discriminated against? And for access living, the answer is yes. Because for access living, it was on access living as a federally chartered organization, which is designed to enable disabled people to live an independent life. And what we pled in our complaint, which should be taken as true for purposes of this motion, is that access living has differently abled or disabled people who are its workforce, which is what it's required to do, and those individuals could not be transported to places such as, do the grassroots organizing to meetings through Uber. They had to use alternative means, which raised additional resources and cost additional resources, to access living. So in that sense, access living was subjected to discrimination because its people could not be transported by Uber to do the work of the organization. Mr. Blonder, Mr. Blonder, good morning. This is Judge Rovner in the ether. I have been wondering if access living's attempt in the amended complaint to increase the geographical facts of the case might be prejudicial to Uber. I know that access living says that no additional discovery would be needed, but it's not clear to me that that is correct. So first of all, Judge Rovner, we were not trying to increase the scope. In the prayer for relief in the original complaint and the proposed amended complaint, we talked about the entire service area that Uber covers. So that's no different between original complaint and proposed amended complaint. What was different was we alleged that Ronnie Patrick, for example, in addition to traveling within the city, within Uber's service area, also would go to a restaurant in Berwyn or other places. If Uber had engaged in any meaningful discovery in the case, they would have taken Ronnie's deposition and they would have found out that she travels both in the city and out of the city. So there's nothing new about it other than it being stated there, number one. Number two, in terms of prejudice, any prejudice here is of Uber's own making. Uber very definitively told Judge Shah almost a year ago into the case that they were going to engage in a big discovery battle because they wanted to avoid the issue of are they a travel service or a public accommodation. They predicted they would do it, and they did it. They didn't go forward with a single deposition in the case. They didn't push any discovery. Their strategy was to defend and obstruct. And then later they changed strategies, and more than a year into the case they filed the motion that led to the dismissal of the complaint. So this was the first opportunity that Access Living and Ronnie Patrick had to amend their complaint, and they sought to take it. It wasn't that Access Living or Ronnie in any way delayed or deferred trying to put the facts or issues in play. It was a choice of Uber's own making by the way they defended the case that led to that result. Judge Scudder, in terms of your questions about going to- Before we go to Judge Scudder, Judge Rovner, the camera at your end appears to give us a wonderful view of the ceiling. If there's some chance you could point it down toward you, that might help. But you'll be frightened. It's hard enough for the lawyers. A little lower and your smiling face will be in view. All right, well- Thank you. We're still only seeing the upper half of your face. Well, I think it's the- Let's see. I'll give you some extra time. Thank you. Okay. Judge Scudder, going back to your question about the statute. Under 1288, Access Living itself was subject to discrimination because it couldn't transport its people and requiring additional costs. Second way Access Living was discriminated against goes to frustration of mission, which here is directly tied to bringing its people to do the advocacy and ensure independent living for people who are disabled. So in that sense, Access Living fits directly within the statute under who can assert the claim here. Okay. Would you mind if I press you on that a bit? That's fine. So in 1282, the B1E provision, Congress worded that in terms of a- I'm going to excise some words just to get to the operative words. The denial of equal services. Right? There's no allegation here that, you know, you've been denied a corporate- Access Living, that is, has been denied a corporate account or that, you know, like some of the examples that come through in the other cases that folks that are not disabled or wheelchair bound are not able to use Uber or anything like that. And my sense is that that's- I know you'll disagree with it, but that's what led the district court to say it's indirect. It's not direct. The district court went into an indirect analysis. I think that is probably what led the district court to get into the indirect analysis. Right. It's not direct to the corporation. It's indirect because the discrimination, the alleged discrimination is occurring vis-a-vis, you know, the folks that are in motorized wheelchairs that are employees or volunteers or what have you. Well, but it's direct to Access Living as well because Access Living had to expend additional resources that couldn't be used for other things. It was Access Living based on the makeup of its workforce that was discriminated against by Uber because Access Living, again, taking our allegations is true. Access Living had to bring the additional resources to transport its people, for example, to the meeting with Congressman Foster. It sounds like a disparate impact argument rather than a disparate treatment argument. Uber treats Access Living just like any other firm, but as a result, Access Living ends up with higher costs of doing business. Is that a disparate treatment argument at all? It would be, Judge, because the same way we look at the base ADA statute, take a disabled person for whom Uber treats everyone the same, and so an individual who in a motorized wheelchair can't transfer into an Uber vehicle is no different than Access Living being unable to put its people into the vehicle. It's just a different way of the function. It sounds like you're just denying that disparate impact and disparate treatment are different things. I'm sorry. I missed your question, Judge. Sorry. It sounds like you're just asserting that disparate treatment and disparate impact are all the same, but that's not the Supreme Court's view. It's not the Supreme Court, and I agree with you, but it can be the same in certain instances such as here where, again, it's Access Living. Take a company, for example, that would have – Does this law cover disparate impact claims at all? The law covers discrimination. Does it cover disparate impact claims? I don't believe directly it would based on that bucket, but I believe this is a – Say that again, based on what? Just based on the bucket itself if you had just an isolated issue, but I believe here Access Living operates through its employees the same way any other company does or any other entity. So the fact that Access Living can't transport its people to do their job is discrimination against Access Living, and that's how Access Living fits within the statute in addition to the issues of frustration and purpose. Yes, Judge Roe. Thank you, Mr. Blonder. Under your definition of what it means to be subject to discrimination, what would be a limiting factor for an entity like Access Living? In other words, can you give me an example of when an organization would not be subject to – because its members had been discriminated against? Sure. If Access Living, for example, had members, if you will, or employees who were all over the country, and let's assume you had a building in Hawaii which was not handicapped accessible, and so if outside the scope of Access Living's employment, one of the people who were employed by it tried to go into that building and couldn't because it wasn't accessible, that would be an example where Access Living would not be subject to it. The fact that simply someone's an employee of Access Living or a member of Access Living would not give it a claim because it's not subject to discrimination, it's not affected by discrimination. So that would be the best example I can come up with on the spot where the limiting factor, if you will – I mean, subject to is not a defined term in the statute, so we used a common sense definition, and we've given the Webster definition, which means affected by. I mean, there's a series of other definitions which would all be the same, but the fundamental issue is, is someone affected by discrimination? For Ronnie Patrick, she was affected by discrimination in two ways. One, she's a motorized wheelchair user herself, and second, her husband is a motorized wheelchair user. Ronnie can sometimes transfer to a non-wave vehicle. Her husband never can. So Ronnie there has standing and injury directly because she herself cannot transfer. I'd like to reserve the remainder of my time for rebuttal. Certainly, counsel. Mr. Killian. Good morning, Your Honors. May it please the Court. There are two distinct issues for us to discuss today. One is this question about Access Living's cause of action, the statutory question, and then a distinct question about Article III standing for Ms. Patrick. Since we spent a lot of time already on the cause of action question, I propose to start there with Your Honors. So it's important to make clear that Access Living is suing in this case only for itself. It is not asserting an organizational or an associational standing on behalf of its members. It is claiming a direct injury to itself, and so the question arises under Section 12188. Is Access Living itself being subjected to discrimination? Subjected to has a clear and accepted meaning. It means a direct and personal object of discrimination. Mr. Blonder has cited in his reply brief a definition of subjected to as meaning affected by. That's not the definition I see when I look in the dictionary. The primary definition of subjected to is to cause to put up with, and I think a simple example would demonstrate to the Court why his definition is much broader than what we think of as the actual meaning of subjected to. Why has not been subject to discrimination as described in the ADA? Why hasn't Access Living been subject to discrimination? By having to pay more to transport its employees and volunteers around the city and not be able, it would seem, to do anything in the suburbs. Sure, Your Honor. So I think the subjected to discrimination in this context is a question of who is requesting the rides through the app, and then it's from our read of the complaint, Access Living is simply paying for that on the back end. The people who are requesting these rides are what they call their grassroots advocates or their volunteers, people who do not have a sort of agency relationship with Access Living. And so this appears to be a situation where Access Living has a budget for transporting people around. Those people are requesting rides, and according to the allegations of the complaint, are paying too much for them. The subjects of the discrimination, as they've alleged it, are the individuals in the wheelchairs who are not requesting rides through Uber. So, Mr. Killian, step outside of the facts of this case, if you don't mind, and just give me a hypothetical of where an entity, you know, a corporation like this, can invoke 12188 on the basis of the association of discrimination protection conferred in that 182 provision. Sure. So 182B1E for the discrimination by association provision requires that the entity itself be denied a service and then have to satisfy that double known requirement. So we'll assume, I guess, for your hypothetical, that the double known requirement can be satisfied. I think a classic example would be where an entity wants to lease a building for its employees, and when the building owner sees that there are disabled employees or disabled individuals associated with or who are working with that entity, the owner of the building says, I'm not giving you this lease. That's the district court's example. Exactly. And I think that is kind of a heartland example here. And the reason our case is different is Access Living has not alleged, as Your Honor noted earlier, that it has an Uber corporate account or that it has ever attempted to request rides itself. Instead, what the allegations are, and in fact, there's no allegations that anyone has attempted to request a ride, right? This is the failure to request rides because they allege that it is. So suppose hypothetically, and I'm only asking the example to try to find the legal line, not suggesting anybody would ever do anything like this, okay? But suggest a ride-sharing company, Uber or anybody else, offered corporate rates for transportation services, just kind of flat-fee corporate accounts for a certain number of rides a month or what have you. And it chose to charge more for companies that employed a certain percentage of individuals that, you know, were in motorized wheelchairs or otherwise had a disability. Would that violate that 12-182-B1E provision? Assuming that there was a known association. A differential rate like that. Right, and so that Uber is doing that knowing that there's an association. Everybody knows, you know, a company writes a letter that says, you know, and two companies sit right next to each other and one has a higher corporate monthly fee than another. All facts are known. And in Your Honor's hypothetical, the corporation has created an account with Uber and has gone through this process. They've got it on the app. Right, if they've got it on the app, then I think that there is a much stronger case that there has been something subjected to. Okay, and how is that functionally really any different here? You don't have a monthly corporate account or anything programmatically happening like this, but isn't access living saying that, you know, over the course of a month, we're going to incur X in costs and X is higher than we otherwise would have to? Well, I think a critical difference, Your Honor, is that in your hypothetical, the corporation has attempted to enter into or has entered into a relationship with Uber and has requested services for itself. But while there may be, it may feel like a fine distinction, when the individuals are the ones who are interfacing with the Uber app and the individuals are the ones who are requesting rides and the entity is simply in the back, you know, in the ether, in the back end providing reimbursement, that may be sort of an Article III injury, which is the argument that access living has articulated in this case, that they are, as an Article III matter, suffering an injury in fact, because they have to pay more, but it's through this reimbursement relationship. And so when Congress wrote the cause of action to be individuals subjected to discrimination, that subjected to is a direct and personal denial of a benefit. And so, you know, this sort of indirect reimbursement relationship that Uber has set up, I think, or excuse me, not Uber, that access living alleges in this case, is critically different on the language of 12188. And 12188 is unique. I'm sorry, Judge Roper. Mr. Tillian, access living has asked, and I'm quoting, how much humiliation did Congress intend a person with disabilities to suffer to qualify for relief under the ADA? How would you answer that? That's a complicated question, Your Honor, because it implicates whether the Teamsters, and I'll do my best to answer it, but it implicates whether the Teamsters case has been incorporated into the Americans with Disabilities Act. That's a case where the Supreme Court, in a non-disability and non-standing, non-cause of action sense, addressed the question of whether the United States government could seek a remedy on behalf of black individuals who did not apply for a job at a racially discriminatory corporation. And in that case, the court said, in that situation, if the United States could prove that the process of applying for the job was humiliating and would have led to the certain rejection of that individual, then the United States could obtain recovery on behalf of those distinct class of individuals. And so there have been some cases, I think, largely out of the Ninth Circuit, that have read through the legislative history of the Americans with Disabilities Act and deduced that the second sentence of 12188's reference to fetal gesture was somehow an attempt to incorporate the Teamsters logic into the ADA. And so if that's the link between the two, then Teamsters says it has to be the humiliation of certain rejection. And although this, I think, question gets a little bit more potentially to the questions of standing, access living has not demonstrated to the court, at least I don't think it's put forth an argument other than Ipsy Dixit in its brief, that downloading the app, creating an account, and checking to see the wait times is somehow a humiliating act. We think this is much more like the Fourth Circuit's Fox v. Baltimore case, where the Fourth Circuit held that having to put your name on a waiting list was not humiliating because it doesn't involve the sort of interpersonal relationships, the connection where a person could be subject to that kind of humiliation. And so I do want to... Well, yeah, when you say that the discrimination by association provision is of no help to Title III, do you mean to say that if an Uber driver refuses to pick up a woman who is married to a man with AIDS, simply because she is married to a man with AIDS, that this is not a discrimination under the ADA? Oh, I think that would be a clear case of discrimination of association. What is the difference here? Well, are we speaking about Access Living, Your Honor? Yes. Okay, because in your hypothetical, as I understand it, the woman is requesting a ride and the driver is saying no for a reason related to a disability. Here, Access Living has not ever requested a ride. It is simply in the background providing reimbursement and therefore has not been subject to discrimination, which takes me to the point I wanted to highlight. This provision of 12188 is the only cause of action in 42 U.S.C. where Congress used the phrase subject to or subjected to in the cause of action itself. There are many anti-discrimination substantive prohibitions throughout 42 U.S.C. that say no person shall be subjected to discrimination on the basis of race or on the basis of ethnicity. And then when Congress wrote the cause of actions for those other prohibitions, it wrote them much more broadly. It wrote them to say that any person aggrieved by a violation of the statute may bring an action or any person injured by that. And so Congress wrote the cause of actions for the other anti-discrimination provisions in 42 U.S.C. to include entities like Access Living who allege an Article III injury as a result of someone else's discrimination. But in the ADA, Congress chose to write the cause of action very narrowly, and it is limited only to individuals who have been subjected to discrimination. And because disability is in the statute defined in a personal way, it's undisputed that an entity, a corporate entity, cannot have a disability within the meaning of the ADA. And so only when a corporate entity satisfies 12182B1E's discrimination by association provision could a corporate entity have a cause of action under 12188. And indeed, I'm just going to say that 12182B1E specifically uses the phrase an individual or entity who is because of the, who is, shall be discriminated to exclude or otherwise denied equal services to an individual or entity. And in that specific way, Congress acknowledged that corporate entities may have a right under 12182B1E, and that would be enforceable under 12188, the cause of action provision. It sounds to me, Mr. Killian, like the kind of upshot at the end of the day is you're saying, sure, in paragraphs 81, 84, elsewhere in the proposed amended complaint, Access Living alleges that it would experience increased costs and what have you. But that's not enough. It's still indirect. It did not try, it didn't go further and try to set up a corporate account or arrange a corporate contract with the defendant or anything else, you know, more direct like that. Yep. That is where we sort of rest ultimately on Judge Shah's denial of the motion for leave to amend as to Access Living. Access Living didn't make out a cause of action in its first complaint, and its amendments in the proposed amended complaint didn't close the gap. As Mr. Blonder has continued to argue in his brief to this court, their position is that 12188 is coextensive with Article 3, and that they have a cause of action simply because they allege that they have an injury in fact. And the text of 12188 disproves that these two are coextensive. So if they try to bring a new complaint encompassing all of your views, they would be able to run with that? We would, if they filed a new complaint, Your Honor, we would have our defenses and other arguments that we could raise in connection with that. It is hypothetical. To go back several years, Access Living could have done many things differently. They could have attempted a derivative third-party standing on behalf of members, but they chose not to do that. They could have said at the outset that they thought this case was about not just the city of Chicago, but the entire suburbs and the hundreds of cities that surround the city of Chicago, but they did not do that. If they filed a new complaint, we would take up in response to that what defenses we think we have in connection with it. But it seems to me you're saying if they had done that, it would be fine. What I'm saying, Your Honor, is that it would be a different case, and they went down a path that they chose to assert a standing theory and a cause of action that was limited to the association's own injuries and nothing derivative. Now, as to the scope of the case, the court only needs to address that aspect of Judge Shah's denial of the motion to amend if the court disagrees with either the district court's denial on Article III standing for Ms. Patrick or if it disagrees with the scope of the cause of action. Because those two, if the judge is affirmed, if the district court is affirmed simply on the Article III standing and the cause of action question, there's no need to get into whether or not it was an abuse of discretion to deny the amendment. In connection with that, we do believe, though, that the court correctly and reasonably denied that amendment. But I'd like to spend a few more moments, if I can, on the question of Ms. Patrick's Article III standing because we haven't discussed that today, and it is a pillar of the district court's decision that needs to be addressed. The district court held that Ms. Patrick has not alleged Article III injury in fact, and we believe that there are four key allegations in the complaint that show that the district court was correct, that she does not have an ongoing injury, that she does not have a certainly impending concrete and particularized injury. Those are the elements that Article III's injury in fact requires, both that it be sort of certainly impending and that it be a concrete and particularized. The four key allegations I point the court to, and probably the most important of them, is that she alleges she only sometimes needs a wave. That's at paragraph 39 in the amended complaint. And why is that not an injury? She alleges that she's injured on even-numbered days and not on odd-numbered days. She can sometimes get around, and sometimes she needs a car that can handle a motorized wheelchair. And so the question would be— Fifty percent of something is still something. And we'd have to—she has to close the gap, though, Your Honor. So we agree— Close the gap with what? Well— Being injured on odd-numbered days is an injury. Two aspects, Your Honor. First, we don't know the frequency. We don't know if it's one day out of 365 or whether, as Your Honor hypothesized, it's one day out of two. Why in the world do you have to know the frequency? Because we— Why isn't her episodic need for a wheelchair-accessible vehicle sufficient? The fact that she doesn't always need an accommodation doesn't make it speculative. Well, Your Honor, what makes it speculative— Put it differently. One day out of 365 tells you that the damages might be small. It doesn't tell you that there's no injury. No, I disagree, because that one day may be a day, Your Honor, where she doesn't need to be transported. In other words, a day where she has difficulty getting into a regular vehicle and thus would prefer to transport via a WAVE may not be one of those days where she wants to take one of these future trips. We have to take her at her word in the allegations of her complaint. She says that she would like to use WAVEs to go to meetings, but she didn't tell us when those meetings are, how frequent those meetings are, and she told us that she would like to go to a restaurant with her husband. And that she would like to go with her husband, who needs a motorized wheelchair all the time. Correct. But, Your Honor, to show—to meet the exacting standard of a certainly impending injury— I don't think standing is an exacting standard. Fair. But it is—there is a difference between a possible future injury, where we are left to speculate whether the stars will align on the day that she needs to have— Mr. Killian, it's— Do you have to know when your non-disabled riders— do you have to know every time they're going to a restaurant ahead of time? I don't understand your argument at all. No. Well, I'll try one more run at it. Or suppose the plaintiff says, I have arthritis, right? My arthritis is so bad I can't get around except with X. Correct. Does she have to file a complaint identifying what day that will be? No. That would be bizarre. No, but if she also says, Your Honor, that I might only need to use a vehicle a couple days a year, and Ms. Patrick alleges that she is a city dweller, and that she may not need to use motorized vehicles to get around a lot, we are left to close the gap.  It's a vague allegation of a sometimes need to use a wave. It's a vague allegation of a sometimes desire to travel places where she needs a car. And then there are two other factors that do relate to her standing. Sounds like everyone I know that uses Uber. Well, and the point is, with someone who has an episodic disability, as she alleges, she needs to allege a little bit more to get over from the possible future injury to the certainly impending. I want to add two other facts there. There are two other allegations that are important to this. Number three is that she alleges that this is a case about wait times being too long. And so the question will be, on the day when she sometimes needs a wave, assuming it's also a day where she wants to go to the temple or go to a restaurant or have one of these unspecific meetings, what's the wait time going to be on that day? All of this sounds like just a disguised argument that longer wait times is not discrimination. It's a substantive matter. It's not an argument about standing. No, it is because she can't predict. Standing is an identifiable trifle. There's something here that may be more than a trifle and is identifiable, but that you can't pin it down to a day when it's episodic seems to me irrelevant. Okay. Well, my last point on this aspect of the speculativeness and the future injury, Your Honor, is to point out simply that Ms. Patrick also has never downloaded the app, has never created an account, and has never logged on even to see what the wait times actually are. Now, the other half of Article III, injury and fact requirement, not only is that it be certainly impending, but the other component is that it be concrete and particularized. And so if Your Honors aren't with me that she has failed to make out a certainly impending injury, then the question still is, is her future injury here concrete and particularized? And for three reasons, we think that the deterrence theory she has articulated is not plausible. Number one, although this probably won't scan based on seeing my time is up, Your Honor, may I finish the point or would you prefer that I not? Okay. Thank you very much. You're welcome. Anything further, Mr. Blunder? Yes, briefly, Your Honor. And I'll begin where counsel left off talking about Ms. Patrick. Paragraphs 40 through 45 of the proposed amended complaint detail her knowledge of the app and her knowledge of the fact that Uber was not available. Paragraph 7 of the proposed amended complaint discusses did she have knowledge that a ride was not available when she's never tried? Several ways, Your Honor. Number one, Access Living, of which Ms. Patrick was a top employee, met with Uber, and it's alleged in paragraph 70, prior to the complaint being filed, and Uber told them they weren't going to provide the service. That's number one. No, Uber told her they weren't going to change the existing response times. They do, in fact, provide service when people want to provide it. The question I'm asking is why not download the app, check, and say, on Tuesday, November 23rd, I needed to get from here to there, their wait time was much too long. It wouldn't work for me. Apparently that's never been done. She has not actually downloaded the app. She's aware that Uber takes the position there's an arbitration provision in the app, and once you download it, they take the position you can't bring that claim into a court. So number one, that's an issue. I don't get it. Behaving strategically in an effort to avoid a contract doesn't sound like a ground of standing. Number two, it would have been futile because she had seen the app downloaded by other people showing no WAVE vehicles being available. So she took, one, her knowledge from the meeting with Uber. Two, having seen the app from other people, and we allege that, again, in paragraphs 40 through 45 of the proposed amended complaint, that she was personally aware that there were no Uber WAVE vehicles available. In paragraph 46, where she talks about her proposed, where she had to go to the meeting and had to use other means to get to the meeting to accomplish what she was doing. The law recognizes futile gestures, and we talk about the humiliation point, and that was kind of where counsel was going before in Teamsters, and Teamsters applies to Ms. Patrick as opposed to Access Living. Certain rejection is humiliation. I mean, that's what the Teamsters. Look, I'm now completely lost. I thought the allegation was that Uber had longer response times for people who needed wheelchair transport, not that it simply refused to accommodate those requests. It's actually both, Your Honor. Paragraphs 40 through 45 of the complaint, we talk about, for example, 42. Before the filing of this lawsuit, Ronnie saw images of Uber's app showing that there were no wheelchair-accessible vehicles available on Uber's travel service at her home address. Paragraph 43, you know, same thing. So we're alleging that they weren't actually providing the service. I must say, people who try to get Uber rides in some parts of Chicago at some times and are perfectly able will find the same thing. That is perhaps correct, Your Honor, but that's not the issue. But why is that anything like discrimination? It could be discrimination based on whatever the facts may be as to why that person can't get a ride. For example, if there's a racial issue, if there's some other issue, but that's not this case. This case is a disabled person who wanted to use Uber, saw the app, and saw that there were no vehicles available. That's the allegation here, and that's the claim. Separate and apart from what we're discussing here, the Article III injury or lack thereof with Ms. Patrick. She has a separate claim, right, the statutory claim? Yes. And you view that as it's separate and apart, doesn't have anything to do with what we were just talking about. Yes, the associational claim. The associational claim based upon her husband's circumstances. Yes. And that just circles the wagon right back to what we were talking about in the first half of the argument. Correct. We go back to the associational claim where it's known that her husband can't travel outside of using a WAVE vehicle. It's her husband. She wants to travel with him, whether it's a restaurant, their temple. So it's just a whole direct-indirect. They're not telling her under no circumstance will we give you a ride because you're married to somebody that has a motorized wheelchair. It's not that. Right. She can't travel with her husband who is known to need the motorized wheelchair. Right. Okay. Second issue is go back to the Subject 2 language that we were talking about in Section 1288. And so, first of all, I'll note that in Section 2000E, there's also Subject 2 language. So it's not the only place in the statute that it comes up. Second point is the statute at different places uses person or individual and entity. It uses person in Section 1288. So just taking the plain language of the statute, they didn't mean to restrict it to individuals the way that counsel suggested. Last point is car service is no different than a lease. If you can't put your people in a car, it's no different than you can't put your people in a building. Thank you, and we ask you to reverse the district court. Thank you very much, counsel. The case is taken under advisement.